### RHODE ISLAND HOSPITAL TRUST NATIONAL BANK, Plaintiff,

v.

### SAN GABRIEL HYDROELECTRIC PARTNERSHIP, RHM Energy Development Corporation and Hydrowest of California, Inc., Defendants.

### Civ. A. No. 86–0773 L.

United States District Court,
D. Rhode Island,
First Division.

Aug. 21, 1987.

Mark A. Pogue, Edwards and Angell, Providence, R.I., for plaintiff.

Gerard M. DeCelles, Providence, R.I., for defendants.

## OPINION AND ORDER

LAGUEUX, District Judge.

The sole issue presented by the parties for decision concerns the scope of a federal district court's *in personam* jurisdiction over out-of-state defendants under the due process clause of the United States Constitution. The facts giving rise to this issue are as follows.

Plaintiff, Rhode Island Hospital Trust National Bank (RIHTNB), is a national banking association with its principal place of business in Providence, Rhode Island. Defendant, San Gabriel Hydroelectric Partnership (SGHP), is a limited partnership engaged in the construction and operation of a dam with hydro-electric power generation capability in Los Angeles, California. Defendant, RHM Energy Development Corporation (RHM), is a California corporation with its principal place of business in that state. RHM is a general partner in SGHP. The third defendant named in plaintiff's complaint is Hydrowest of California, Inc. (Hydrowest), a corporation organized under the laws of California and with its principal place of business in that state. Hydrowest is a limited partner in SGHP.

In August of 1984, SGHP approached the Bank of California (BOC) for construction financing of a 4.975 megawatt hydroelectric generating facility located on San Gabriel Dam in Los Angeles County, California. BOC, in turn, contacted RIHTNB in December of 1984, about the possibility of participating in the financing of the project. Later that month, Mr. Phillip Schlernitzauer, a Vice-President at RIHTNB, contacted BOC by telephone and requested that it send financial information for RIHTNB's use in evaluating defendants' loan application. SGHP provided that information, and throughout the following two weeks a number of communications by telephone took place between Schlernitzauer and officials at BOC and RHM concerning the financial information.

On January 10, 1985, RIHTNB's Credit Committee approved the loan application and informed BOC and RHM of this development. Eight days later RIHTNB and BOC entered into a written contract in the form of a commitment letter (First Commitment Letter). This letter was signed on behalf of SGHP by Donald C. Hawkins, President of RHM and by Miles Duffy, President of Hydrowest.

Prior to the execution of the First Commitment Letter, SGHP was waiting for an exemption from licensing from the Federal Energy Regulatory Commission (FERC). It is agreed that because receipt of this waiver did not occur prior to April 30, 1985, as provided in Paragraph 14 of the letter, there was no obligation on the part of BOC or RIHTNB to loan SGHP funds. Accordingly, the First Commitment Letter lapsed.

In January of 1986, RIHTNB claims that it received a telephone call from SGHP through RHM in which it learned that the processing of SGHP's waiver had been completed. In this call, RIHTNB also claims that "SGHP wanted a new loan commitment letter from RIHTNB and BOC." Approximately one week later, a second telephone conversation occurred between RIHTNB and Hawkins in which Hawkins indicated that "he [would be] eager to recommit to a second loan and to get SGHP's offer memo out." In February of 1986, BOC withdrew from the negotiations to loan funds to SGHP; however, RIHTNB

continued these negotiations of its own accord.

On February 19, 1986, Douglas Rastello, a Vice-President of RHM, traveled to Rhode Island and discussed the contemplated financing with staff from RIHTNB. Four days later, plaintiff contends (and it is not disputed) that RHM mailed a cover letter plus a "three-inch thick stack" of SGHP financial and background data to RIHTNB. These materials were to be used in order to decide whether RIHTNB should offer another loan to SGHP. One month later RHM mailed another cover letter and two-inch stack of SGHP material, again for RIHTNB's use in reviewing SGHP's loan request.

On March 18, 1986, RIHTNB executed and mailed to SGHP a second loan commitment letter (Second Commitment Letter). RHM (via Hawkins) executed this letter as General Partner for SGHP on March 31, 1986, and telecopied it back to RIHTNB. Throughout the months of April and May of 1986, further negotiations took place between RIHTNB and RHM. It is agreed that these communications took place in person, by mail and by telephone, and focused on the possibility of modifying the Second Commitment Letter in light of proposed changes to the 1987 federal tax laws. More specifically, on May 12, 1986, Rastello and Peter Nataras, an attorney representing SGHP, flew to Rhode Island from California and met with Schlernitzauer at the offices of RIHTNB. The two executives met for approximately eight hours over two days and eventually came to an understanding concerning a proposal to modify the Second Commitment Letter.

One week later Schlernitzauer flew to Los Angeles, California to look at the project site and to meet with Rastello. At this meeting Schlernitzauer delivered a third committment letter (Third Commitment Letter) to Rastello dated May, 1986. This letter was not signed by RHM.

On August 22, 1986, SGHP informed RIHTNB that it had obtained alternative financing. Several months later RIHTNB brought suit in this Court alleging breach of the Second Commitment Letter. This included defendants' alleged failure to pay a $30,000 facility fee as specified in that letter and $4,031.50 in legal fees incurred by RIHTNB in connection with the proposed loans. Defendants, then, moved to dismiss plaintiffs cause of action under Fed.R.Civ.P. 12(b)(2) for lack of jurisdiction over the person. The matter was heard on June 18, 1987, and taken under advisement. It is now in order for decision.

Consideration of personal jurisdiction requires a federal court to undertake a two-step method of analysis. First, the court must determine whether the requirements of the long-arm statute of the state in which the court is sitting are satisfied. Secondly, the court must determine whether the mandates of the due process clause to the Constitution of the United States have been met.

The first step is but a short hop. The Supreme Court of Rhode Island has interpreted Rhode Island's long-arm statute as reaching to the full breadth of the Fourteenth Amendment's due process clause. *Conn v. ITT Aetna Finance Co.*, 105 R.I. 397, 402, 252 A.2d 184, 186 (1969). Thus, adjudication of the present matter automatically shifts to examination of the second step laid out above.

The United States Supreme Court has indicated that courts must engage in a three-part analysis in determining whether the mandates of the due process clause have been satisfied. First, a court is required to determine whether the jurisdiction exercised is specific or general. Then, depending upon the type of jurisdiction that is exercised, a court must examine the nature of the defendant's contacts with the forum state. Lastly, if the defendant has "minimum contacts" with the forum state, the court must still inquire whether it is "unreasonable" for it to exercise personal jurisdiction in the particular matter.

■ Whether a court's jurisdiction is specific or general depends upon the relationship between plaintiff's claims and defendant's contacts with the forum state. Where plaintiff's claims "arise out of" or are "directly related" to defendant's contacts with the forum state, a court exercis-

es specific jurisdiction. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, n. 8, 104 S.Ct. 1868, 1872, n. 8, 80 L.Ed.2d 404 (1984). Conversely, where plaintiff's claims do not arise out of or are not directly related to defendant's contacts with the forum state, a court exercises general jurisdiction. *Id.* at 414 n. 9, 104 S.Ct. at 1872 n. 9.

It is undisputed in the present case that plaintiff's claims against RHM "arise out of" or are "directly related" to RHM's contacts with the state of Rhode Island. RIHTNB alleges that RHM breached the Second Commitment Letter. The Second Commitment Letter, in turn, was formulated out of a lengthy series of negotiations which occurred between RHM and RIHTNB, at least in part, in Rhode Island. RHM's contacts with Rhode Island, then, directly produced the contract upon which plaintiff's claim rests. Consequently, the jurisdiction purportedly exercised by this Court is specific in nature.

The second part of the Supreme Court's three-part test was most recently discussed by the Court in the case of *Asahi Metal Ind. v. Superior Court*, ─── U.S. ───, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987). There, the Court once again stressed that in order for a federal court to assert personal jurisdiction consonant with requirements of due process, a defendant's actions must be "purposefully directed toward the forum state." *Id.* 107 S.Ct. at 1033 (plurality opinion). Two years prior to the *Asahi* decision, the Court ruled that analysis of purposeful conduct in the contract context must be undertaken by discussion of three considerations:

(1) The parties prior negotiations and contemplated future consequences.

(2) The terms of the contract itself.

(3) The parties actual course of dealing.

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479, 105 S.Ct. 2174, 2185–86, 85 L.Ed.2d 528 (1985).

■ The second of these considerations merits little discussion. There is no choice of law provision in the Second Commitment Letter which would suggest that RHM was purposefully directing its conduct towards Rhode Island. Nonetheless, absence of such a provision is not determinative of the character of RHM's conduct.

■ More important are the first and third considerations. Commencing in February, RHM entered into a continuing series of negotiations with RIHTNB in which RHM sought to obtain financing for its hydroelectric project. It is beyond question that this conduct was purposefully directed at the state of Rhode Island.

On February 19, 1986, Douglas Rastello, Vice President for RHM, visited RIHTNB's principal place of business to discuss the terms of the contemplated financing. This trip was repeated by Rastello, along with a SGHP attorney, in May of the same year in order to discuss modifying the terms of the Second Commitment Letter. Moreover, two packets of SGHP financial information were mailed by RHM to RIHTNB to help the bank assess whether it should make SGHP a loan. Also during this time, numerous telephone communications occurred between Hawkins and Schlernitzauer relating either to the terms of the loan or to changes therein. Finally, the very document upon which plaintiff's claim rests, the Second Commitment Letter, was executed by Hawkins of RHM as a "general partner" for SGHP and then telecopied back to RIHTNB in Rhode Island.

Taken all together the parties prior negotiations indicate that RHM was attempting to reap a benefit from a Rhode Island banking institution. This benefit was obviously financing for its hydroelectric project. RHM's conduct, thus, was purposefully directed towards Rhode Island.

This conclusion is buttressed by the contemplated future consequences of the negotiations between RHM and RIHTNB. The Second Commitment Letter provides for a "Term Loan" with payment to be made on a periodic basis until the year 2002. That RHM would forward payment to RIHTNB over a number of years resembles the long-term nature of the relationship that was present between the parties in the *Burger King* case.

There, an out-of-state defendant was required under the terms of a franchise

agreement to forward monthly payments to its franchisor for a period of twenty years. *Id.* at 465, 105 S.Ct. at 2177–78. Based in part on the long-term character of the contract, the Supreme Court held that the out-of-state defendant could be subject to the long-arm jurisdiction of a federal district court without violating his due process rights. *Id.* at 482, 105 S.Ct. at 2187. Although the carefully structured twenty year relationship in *Burger King* seems to have contemplated a greater degree of interaction between the negotiating parties than would have existed between RHM and RIHTNB, the lengthy nature of the loan's term is still indicative of RHM's purposeful conduct towards the state of Rhode Island. *Ganis Corp. v. Jackson,* 822 F.2d 194, 198 (1st Cir.1987).

◼ RHM, however, contends that RIHTNB was only accommodating BOC, and thus, that RHM had no direct contact with RIHTNB in the present case. This argument is factually flawed. By the time negotiations commenced regarding the Second Commitment Letter, BOC had decided to withdraw from further negotiations concerning financing of the hydroelectric project. All dealings from this point in time through August of 1987 were directly between RHM and RIHTNB. Unlike the fact pattern in *Burger King* where an out-of-state defendant was dealing with a local district office in Michigan as well as franchisor's home office in Florida, RIHTNB was in direct correspondence with RHM throughout the negotiation, consumation, and attempted modification of the pertinent documents in this case. There can be no mistake, then, that RIHTNB was the target of RHM's communications and not some other entity as RHM contends. The parties actual course of dealings in this case, thus, also supports the Court's conclusion that RHM's conduct was purposefully directed towards Rhode Island.

◼ RHM also argues that at no time did it "initiate" contact with RIHTNB with regards to the dispute in question. While whether an out-of-state defendant initiates the transaction which culminates in a formal document may be indicative of the purposeful nature of defendant's conduct, it is not determinative of the issue. The

character and quantity of an out-of-state defendant's many contacts with the forum state may still reveal an intent on his part to reap some benefit from that state even though he has not taken the first step in the overall negotiation process. Were the rule as RHM contends, out-of-state defendants could escape the exercise of a court's personal jurisdiction merely by entering the negotiation process at some time after it commenced. Courts then would be effectively precluded from asserting jurisdiction over these defendants despite the latters' purposeful contacts with the forum state. This result would contravene the Supreme Court's ruling in *Burger King* as well as defy common sense.

◼ The third portion of the Supreme Court's test requires this Court to determine whether it is "unreasonable" for it to assert jurisdiction over RHM. In ruling on this issue, the Supreme Court has mandated that a district court consider the following five factors:

(1) The burden on the defendant.

(2) The interests of the forum state.

(3) Plaintiff's interests in obtaining relief.

(4) The interstate judicial system's interest in obtaining the most efficient resolution of controversies.

(5) The shared interest of the several states in furthering fundamental substantive social policies.

*Asahi Metal Ind.,* 107 S.Ct. at 1034 (1987).

There is little question that RHM would undergo some burden in defending a suit in Rhode Island. Traveling to and from Rhode Island and abiding in the forum state throughout the trial of this case would entail some cost for RHM. Nonetheless, the present matter is distinguishable from *Asahi Metal Ind.* in that RHM would not, as was true of the defendant in that case, be subject to the "unique burdens" of having to defend itself in a "foreign legal system". *Id.*

*Asahi Metal Ind.* is also distinguishable from the present matter with respect to the second and third factors. In *Asahi Metal Ind.* the forum state's interest was slight because plaintiff was not a resident of that state. *Id.* Moreover, the suit in *Asahi*

*Metal Ind.* was primarily one for indemnification, and thus, centered upon resolution of a technical legal issue rather than upon an issue of substantive interest to plaintiff such as vindicating the rights of a severely injured consumer. *Id.*

In the present case, however, RIHTNB is a citizen of Rhode Island. The forum state, therefore, has a direct interest in protecting one of its own lending institutions from any potential wrongdoing on the part of out-of-state businesses. In addition, plaintiff's claim in this suit is directly related to RHM's alleged wrongdoing, breach of contract. Plaintiff, therefore, has a substantive as well as merely monetary interest in vindicating its rights. It follows that plaintiff's interest in obtaining relief is greater than would be the case were its claim premised on the theory of indemnification.

In weighing the first three factors against one another, the Court follows the Supreme Court's intimation that "often the interest of plaintiff and the forum's in the exercise of jurisdiction will justify even serious burdens placed on a ... defendant." *Id.* Thus, despite the lengthy distance which RHM must travel to defend this suit, the Court concludes that it is not unreasonable for RHM to do so given both plaintiff's and the forum state's great interests in having this matter resolved in Rhode Island.

Neither the fourth nor the fifth factors alter this conclusion. It cannot be argued that it would be more efficient to the interstate judicial system to litigate this case in California rather than in Rhode Island. It is unfortunate but nonetheless a fact that one side is located in California and another in Rhode Island. No matter in which state the case is ultimately resolved, the system is going to experience some inefficiency in having one side travel to the other's forum state to litigate some phase of the case.

Finally, the shared interest of the several states would correspond with Rhode Island's substantive interest of ensuring that valid contracts are not offhandedly breached. Since it is Rhode Island, rather than some other state, that has lost business as a result of the alleged breach, it has the greatest interest in enforcing the contract in issue. This factor then tends, if anything, to strengthen the Court's conclusion that it is not unreasonable for the Court to assert jurisdiction over RHM in the present case.

Having concluded that the Court may constitutionally exercise jurisdiction of RHM, it immediately follows that the Court may exercise jurisdiction over SGHP and Hydrowest. Both of these parties gave RHM full authority as general partner to conduct the business of the partnership. All conduct of RHM, therefore, may be imputed to these parties for the purposes of deciding the jurisdiction issue.

For all the above reasons, defendants' motion to dismiss for lack of jurisdiction over the person under Fed.R.Civ.P. 12(b)(2) is denied.

*It is so Ordered.*