**MARINE CHARTER & STORAGE LTD., INC., Plaintiff,**

v.

**DENISON MARINE, INC., Defendant.**

**Civ. A. No. 88–136–Y.**

United States District Court,
D. Massachusetts.

Dec. 20, 1988.

Glen Everett Churchill, Ashland, Mass., for plaintiff.

Jane E. Sender, Posternak, Blankenstein & Lund, Boston, Mass., for defendant.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

This is an action for breach of contract and breach of warranty arising out of the purchase and sale of a yacht. The defendant, Denison Marine, Inc. ("Denison") now moves the Court to dismiss the complaint of the plaintiff, Marine Charter & Storage Ltd., Inc. ("Marine Charter"), on the ground that the Court lacks personal jurisdiction over Denison.

## I. BACKGROUND

When personal jurisdiction is questioned, the burden falls on the plaintiff, through affidavits and other competent evidence, to make out a prima facie case for the existence of personal jurisdiction. *E.g., Home Owners Funding Corp. of America v. Century Bank,* 695 F.Supp. 1343, 1344 (D.Mass.1988); *Val Leasing, Inc. v. Hutson,* 674 F.Supp. 53, 55 (D.Mass.1987); *North American Video Corp. v. Leon,* 480 F.Supp. 213, 215–16 (D.Mass.1979). The facts relevant to Marine Charter's prima facie case for personal jurisdiction and established by the evidence in the record are as follows.

Marine Charter is a Massachusetts corporation that charters yachts for pleasure cruises. Affidavit of Richard E. Terrill ("Terrill Aff.") at paras. 2, 3. Howard A. Fafard, President and Treasurer of Marine Storage, contacted Denison by letter dated March 21, 1986, to indicate his interest in having Denison construct a yacht for Marine Charter. Affidavit of Howard A. Fafard ("Fafard Aff.") at paras. 1, 4. In August, 1986, the parties signed a contract for the construction and sale of a yacht, Fafard Aff. at para. 5, named at this point, unromantically enough, Hull 107. Affidavit of Christopher W. Denison ("Denison Aff.") at paras. 3, 4. Fafard signed the contract in Massachusetts. Fafard Aff. at para. 5.

Many discussions about the construction of the boat, apparently including negotiations leading to the contract, took place in the Dania, Florida offices of Denison. Fafard Aff. at para. 7; Denison Aff. at para. 5. Other communications regarding the construction and purchase of the yacht took

the form of telephone conversations, letters and telecopier transmissions between Marine Charter's Massachusetts office and Denison's Florida office. Fafard Aff. at para. 7. During the course of construction, progress bills and invoices were submitted by Denison to Marine Charter's Massachusetts office for payment. Progress payments were made to Denison by Marine Charter's Massachusetts office through checks drawn on Massachusetts banks. Terrill Aff. at para. 6; Fafard Aff. at para. 9.

Denison may advertise in nationally distributed publications and may exhibit its product outside of Florida. Fafard Aff. at para. 10. Denison may also have sold yachts to other Massachusetts companies. *Id.* at para. 11.[1]

## II. DISCUSSION OF LAW

Determining personal jurisdiction is a two-step process. First, jurisdiction must be found to exist under the Massachusetts long-arm statute. Mass.Gen.Laws ch. 223A, sec. 3. Second, "[t]he hurdle of constitutional due process must also be cleared." *Ealing Corp. v. Harrods, Ltd.,* 790 F.2d 978, 983 (1st Cir.1986).

### A. The Massachusetts Long–Arm Statute.

■ The Massachusetts long-arm statute permits a court to "exercise personal jurisdiction over a person ... [who] (a) trans-

act[s] any business in the commonwealth." Mass.Gen.Laws ch. 223A, sec. 3(a). Section 3(a) has been construed broadly. *E.g., Ealing Corp.,* 790 F.2d at 982; *Hahn v. Vermont Law School,* 698 F.2d 48, 50 (1st Cir.1983); *Nova Biomedical Corp. v. Moller,* 629 F.2d 190, 193–94 (1st Cir.1980); *see also Ross v. Ross,* 371 Mass. 439, 441, 358 N.E.2d 437, 439 (1976). Under such a liberal reading, Marine Charter passes the first jurisdictional test. Marine Charter's assertion of numerous telephone calls, mailings, and telecopier transmissions between its Massachusetts offices and Denison regarding the contract and purchase; bills sent to Massachusetts and payments sent to Florida in response; and the sale of a yacht to a Massachusetts corporation compares favorably with other factual constellations which courts have found to be sufficient to satisfy section 3(a). *See, e.g., Ealing Corp.,* 790 F.2d at 983 (holding that the sending of a telex from the United Kingdom to the Massachusetts plaintiff by the defendant was enough to satisfy the "transacting any business" requirement); *Bond Leather Co. v. Q.T. Shoe Mfg. Co.,* 764 F.2d 928, 932 (1st Cir.1985) (holding that mailing four letters and making one telephone call to Massachusetts satisfied section 3[a]).[2]

### B. Due Process Minimum Contacts.

■ To establish the minimum contacts necessary to satisfy procedural due pro-

---

**1.** Howard Fafard states that the information in this paragraph is true based on information and belief. Fafard Aff. at paras. 10, 11. Although this information is not necessary to the Court's opinion, the Court notes that it is at best dubious whether information not based on personal knowledge can be properly considered by a court determining whether personal jurisdiction exists. *See Copiers Typewriters Calculators v. Toshiba Corp.,* 576 F.Supp. 312, 316 (D.Md.1983) (striking that portion of an affidavit offered by the defendant that was not based on personal knowledge in a decision holding that personal jurisdiction existed over the defendant); *cf. Beyah v. Coughlin,* 789 F.2d 986, 989–90 (2d Cir. 1986) (reversing the granting of summary judgment where the district court relied, *inter alia,* on an affidavit submitted by an affiant who lacked personal knowledge of the facts therein asserted); *but see United States v. Zagari,* 419 F.Supp. 494, 504 n. 29 (N.D.Cal.1976) (holding that an affidavit based on information and be-

lief may be considered at summary judgment in some circumstances).

**2.** Marine Charter also asserts that it satisfies Mass.Gen.Laws ch. 223A, sec. 3(b) which extends long-arm jurisdiction over persons "contracting to supply services or things in the commonwealth." Marine Charter appears to fail under section 3(b), at least based on the record presently before the Court. Although the affidavits are largely silent on this point, the complaint asserts that the boat was launched in Florida in March, 1987. It put in for repairs at various Atlantic seaboard ports over the next five months after some apparently ill-starred voyages. These ports included Thunderbolt, Georgia, Mamaroneck, New York and Middletown, Rhode Island. Complaint at paras. 14, 16, 17 and 19.

The Supreme Judicial Court has interpreted the phrase "in the commonwealth" in section 3(b) to refer to "the place where the services or things are to be supplied...." *Droukas v. Div-*

cess, Marine Charter must show that Denison "purposefully avail[ed] itself of the privilege of conducting activities within [Massachusetts], thus invoking the benefits and protections of its laws," *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958) and thus "should reasonably anticipate being haled into court [here]." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

The mandate of the due process clause is not satisfied unless a defendant's actions have been "purposefully directed toward the forum state." *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92 (1987). In cases such as this one, where the contacts alleged in the case revolve primarily around a contract between the parties, the "contract plus" analysis articulated by the Supreme Court in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479, 105 S.Ct. 2174, 2185, 85 L.Ed.2d 528 (1985) must be followed to determine if purposeful conduct is present. The *Burger King* court enunciated three factors that courts must consider: 1) the parties' prior negotiations; 2) the terms of the contract itself; and 3) the parties' actual and contemplated course of dealing. *Id.*, 105 S.Ct. at 2185.

With respect to the first factor, the parties' prior negotiations, the Court observes initially that neither party disputes that Marine Charter initially contacted Denison in or about March, 1986. However, which party initiated negotiations is not disposi-

tive of purposefulness. "The character and quantity of an out-of-state defendant's many contacts with the forum state may still reveal an intent on his part to reap some benefit from that state even though he has not taken the first step in the overall negotiation process." *Rhode Island Hosp. Trust Nat'l Bank v. San Gabriel Hydroelectric Partnership*, 667 F.Supp. 66, 71 (D.R.I.1987) (holding that a defendant who had not initiated negotiations still had minimum contacts with the forum state).[3] Here, negotiations plainly were extended and involved. As Denison's president, Christopher W. Denison, admitted in his affidavit, "[n]umerous discussions and negotiations were held in my office in Dania, Florida leading up to the execution of the August 7, 1986 contract. Mr. [Howard A.] Fafard [Marine Charter's President and Treasurer] was in my office on the following dates: February 1, 3, 1986; March 13, 18, 1986; April 22, 24, 1986; May 13, 16 and 22, 1986; June 19, 24 and 30, 1986, and July 24 and 25, 1986." Denison Aff. at para. 5. Besides these discussions in Florida, Fafard stated that "most communications regarding the construction and purchase of the yacht took the form of telephone conversations, letters and telecopier transmissions between Marine Charter's Massachusetts office and Denison's Florida office." Fafard Aff. at para. 7. It is unclear from this passage if these communications pertain only to postexecution dealings or also were part of the negotiations leading to the contract executed in August,

---

*ers Training Academy, Inc.*, 375 Mass. 149, 157, 376 N.E.2d 548 (1978). This language suggests that selling a product to a Massachusetts company which is not brought into the Commonwealth does not satisfy section 3(b).

Here, it appears quite possible that Hull 107 was never brought into the Commonwealth or its territorial waters, nor was meant to be. Marine Charter, as its name implies, is in the business of marine rentals and leasing. Complaint at para. 1. Its principal place of business is in Ashland, Massachusetts, which the Court judicially notices is a landlocked community some twenty miles inland. Fed.R.Evid. 201. It thus may be that the boat was intended to be chartered outside the Commonwealth, as its locations when it broke down suggest. Whether,

under these circumstances, Section 3(b) of the long-arm statute is satisfied is an issue this Court need not, and does not, decide inasmuch as the Court has already found Section 3(a) satisfied.

**3.** To hold otherwise, the *Rhode Island Hosp.* Court noted, would allow "out-of-state defendants [to] escape the exercise of a court's personal jurisdiction merely by entering the negotiation process at some point after it commenced. Courts would then be effectively precluded from asserting jurisdiction over these defendants despite the latters' purposeful contacts with the forum state. This result would contravene the Supreme Court's ruling in *Burger King* as well as defy common sense." 667 F.Supp. at 71.

1986.[4] The affidavit of Richard E. Terrill, Marine Charter's Clerk, strongly suggests that the communications to which Fafard referred occurred both before and after the contract's execution. Terrill stated, "Between approximately February of 1986 and June of 1987, I was party to numerous telephone conferences with Christopher W. Denison and others at Denison Marine, Inc. concerning the terms and conditions of the [contract] between Marine Charter and Denison Marine, Inc. for the purchase of Hull 107, the status of the construction, charges and payments, and so forth." Terrill Aff. at para. 4. In any event, Terrill's affidavit establishes that in addition to the meetings in Florida, numerous other communications took place between the parties before the contract's execution.

■ With respect to the terms of the contract itself, the Court notes first that the contract contains a clause stipulating that it "shall be construed in accordance with the laws of the State of Florida." Yacht Construction Agreement ("the Agreement") at para. 13. In *Burger King,* the franchise agreement signed by the defendant contained a choice of law provision stipulating that the law of the forum state governed all disputes arising from the agreement. 471 U.S. at 481, 105 S.Ct. at 2187. The Supreme Court held that such a provision is a factor that courts should consider in evaluating contracts, although such a clause by itself is insufficient to confer jurisdiction.[5] 471 U.S. at 481–82, 105 S.Ct. at 2187. Thus, the choice of law provision here, while certainly probative, is not determinative of whether the defendant purposefully availed itself of the benefits and protections of Massachusetts law. *See Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.,* 784 F.2d 1392, 1399–1400 (9th Cir.1986) (holding that a choice of law provision stipulating that the law of a jurisdiction other than the forum

state "alone will not suffice to block jurisdiction").

Other considerations with respect to the terms of the contract blend into considerations respecting the third factor, the parties' actual and contemplated course of dealing. The contract between the parties contains the following provision:

> Inspection Rights and Obligations of MARINE CHARTER. MARINE CHARTER and its agent who is designated as (person to be named later) shall have access to the Yacht, the equipment, materials to be used in the construction of the Yacht during normal business hours of DENISON MARINE's facilties [sic]. MARINE CHARTER shall exercise reasonable diligence in inspecting the Yacht during its construction and reporting to DENISON MARINE (a) complaints concerning the materials and workmanship and (b) variations from Plans and Specifications, including modifications, any of which are unsatisfactory to MARINE CHARTER. In the event that MARINE CHARTER or its agent shall discover any construction or material which it believes does not or will not conform to the requirements of the Contract and Specifications, it shall promptly notify DENISON MARINE in writing of such non-conformity.

Agreement at para. F(3).

As the contract makes explicit, the parties clearly contemplated an extensive post-execution relationship. Marine Charter had not only the right but the obligation to monitor closely the yacht's construction to ensure the proper quality of the materials and workmanship, to report any unsatisfactory deviations from the yacht's plans and specifications, and to notify Denison of any non-conformity. Each party had the right to arbitration to resolve disputes about conformity. *Id.* Modifications of the plans

---

4. For example, Fafard attached to his affidavit as exhibits several letters that passed between the parties, all of which post-date the contract.

5. The *Burger King* court concluded that, when combined with the 20–year interdependent relationship the defendant had established with Burger King's Miami headquarters, the choice

of law provision reinforced his deliberate affiliation with the forum state and the reasonable foreseeability of possible litigation there. 471 U.S. at 482, 105 S.Ct. at 2187. Based on these contacts, the Supreme Court found the due process clause satisfied.

were permitted when such modifications were mutually agreed upon in writing by the parties. Agreement at para. F(5).

The contract further provided that the yacht would be delivered for an "informal shake-down/charter" prior to its completion. Agreement at para. C. After this first charter, Marine Charter was to return the yacht to Denison for "the repairs or alterations that are discovered on the first charter so that the Yacht can be made ready for final acceptance." Agreement at para. D. Because the Agreement stipulated that the yacht was "to be completed and ready for acceptance ... on or about February 15, 1987," Agreement at para. D, it is a fair inference that the parties expected a continuing and extensive relationship for at least six months following the August, 1986 execution of the Agreement.

Indeed, this appears to be precisely the kind of relationship that eventuated between the parties.[6] As already discussed, Fafard asserts numerous "communications regarding the construction and purchase of the yacht [in] the form of telephone conversations, letters and telecopier transmissions between Marine Charter and Denison." Fafard Aff. at para. 7. By way of example, Fafard presented ten letters sent from one party to the other between August, 1986 and August, 1987. The letters refer to forty-eight change orders, progress payments attendant upon completion of certain work,[7] a notice that certain work would not be completed in time for the shakedown cruise scheduled for November 26, 1986, and Marine Charter's dissatisfaction with the yacht as of August 27, 1987. *See* Fafard Aff., Exhibits C–1, C–10.

The post-execution telephone conversations and, presumably, the post-execution telecopier transmissions covered similar ground. *See* Terrill Aff. at para. 4. In addition, progress bills and invoices were submitted by Denison to Marine Charter's Massachusetts office for payment. Fafard Aff. at para. 8; Terrill Aff. at 6. Such payments were made to Denison by Marine Charter's office and were made by checks drawn on Massachusetts banks. Fafard aff. at para. 9; Terrill Aff. at 6.

This Court holds, weighing all the factors *Burger King* requires be considered in determining whether the defendant's actions were purposefully directed toward Massachusetts, that Denison has established minimum contacts with Massachusetts. Although the parties agreed that Florida law would govern the contract, that factor is overwhelmed by the relationship contemplated by the Agreement into which they entered, and by the extensive relationship in which the parties engaged before and after the execution of the contract. Buying a yacht does not involve the limited relationship between the passive purchaser and the seller of paper that this Court faced in *L & P Converters, Inc. v. H.M.S. Direct Mail Serv., Inc.,* 634 F.Supp. 365, 366 (D.Mass.1986), or even that of the buyer and seller of a car. Rather, it is more akin to the relationship between a builder and an individual contracting to have a new house built. *See generally* J. Rousmaniere, *The Luxury Yachts* (Time–Life Books Inc. 1981). Lengthy negotiations preceded the Agreement to build this apparently one-of-a-kind yacht.[8] *See* Fafard Aff., Exhibit C–10. An extensive working relationship was contemplated by the contract and came to pass, a relationship necessary both to ensure the proper construction of the yacht and to facilitate the apparently inevitable series of changes—at least 48 in number[9]—from the original plans and specifications that the custom building of a yacht entails. These myriad long-term contacts between the parties form precisely the type

---

**6.** In fact, the relationship was even more extensive than contemplated, lasting a full year due to the unforeseen problems with the yacht.

**7.** For example, the letters refer to payments for "Basic Electrical 90% Complete," "Basic Mechanical 90% Complete," and "Basic Joiner 90% Complete." *See* Fafard Aff., Exhibits C–3, C–5, C–7.

**8.** Despite his dissatisfaction with the yacht, Fafard described it as a "show-stopper" and urged Denison's cooperation in repairing the yacht "to prove she's the best." Fafard Aff., Exhibit C–10.

**9.** *See* Fafard Aff., Exhibit C–9.

of relationship that the Supreme Court and the First Circuit have found satisfies "contract-plus" analysis. *See, e.g., Burger King,* 471 U.S. 462, 105 S.Ct. 2174 (1985); *Ganis Corp. of California,* 822 F.2d 194 (1st Cir.1987). This Court similarly finds the minimum contacts requirement satisfied here.

C.   The Reasonableness of Jurisdiction.

■   The Supreme Court in *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 1034, 94 L.Ed.2d 92 (1987), has required, as a final matter, that this Court determine, despite its contracts-plus analysis, whether its assertion of jurisdiction over Denison is unreasonable. The five factors to be considered are:

(1) The burden on the defendant.
(2) The interests of the forum state.
(3) The plaintiff's interests in obtaining relief.
(4) The interstate judicial system's interest in obtaining the most efficient resolution of controversies.
(5) The shared interest of the several states in furthering fundamental substantive social policies.

*Asahi Metal,* 107 S.Ct. at 1034.

The instant case is considerably different from *Asahi Metal,* where the Supreme Court held that the facts therein did "not establish minimum contacts such that the exercise of personal jurisdiction is consistent with fair play and substantial justice," *id.* at 1035, in part because the above factors "reveal[ed] the unreasonableness of jurisdiction over [the defendant]". *Id.* at 1034. There, the burden on the third-party defendant,[10] headquartered in Japan, to litigate in California was great; the interests of the forum state were slight because the transaction had occurred in Taiwan and neither party was a California resident; and the third-party plaintiff failed to demonstrate that it was more convenient for it

to litigate its indemnification claim in California.   As for the fourth and fifth factors, the Supreme Court noted that the foreign nationality of the two parties raised issues peculiar to that case which also cut against the reasonableness of jurisdiction.

In weighing the five factors in the present matter, this Court finds the analysis of *Rhode Island Hosp.,* 667 F.Supp. 66 (D.R.I.1987) to be directly on point, and the decision therein directly on the mark.  The Court notes that litigation in Massachusetts would place some burden on Denison, albeit a burden considerably alleviated by the option of retaining local counsel in the matter.  The burden is certainly no greater than was present in *Rhode Island Hosp.,* where jurisdiction of a Rhode Island court over a California defendant was found reasonable.   667 F.Supp. at 72.[11]   In the present case, as in *Rhode Island Hosp.,* "the forum state ... has a direct interest in protecting one of its own [corporations] from any potential wrongdoing on the part of out-of-state businesses."  *Id.*   Marine Charter's interest in obtaining relief is stronger than that of the third-party plaintiff in *Asahi Metal* because it seeks "a substantive as well as merely monetary [relief] in vindicating its rights."  *Id.*   As was the case in *Rhode Island Hosp.,* Marine Charter's "interest in obtaining relief is greater than would be the case were its claim premised [merely] on the theory of indemnification," which was the plaintiff's theory in *Asahi Metal.   Id.*

As for the final two factors, the efficiency of the interstate judicial system will not be affected whether this case is tried in Florida or Massachusetts.  As the *Rhode Island Hosp.* court noted:

It is unfortunate but nonetheless a fact that one side is located in California and another in Rhode Island.  No matter in which state the case is ultimately resolved, the system is going to experience

---

**10.**   All other claims except the cross-complainant's claim for indemnification had been settled and dismissed when this issue arose.  The Supreme Court treated the third-party plaintiff as the plaintiff, and the third-party defendant as the defendant, for the purposes of its analysis. *See id.* at 1034.

**11.**   *Asahi Metal* is clearly distinguishable because the third-party defendant in that case was a Japanese defendant disputing the jurisdiction of a California court.   *Asahi Metal,* 107 S.Ct. at 1030.

some inefficiency in having one side travel to the other's forum state to litigate some phase of this case.

*Id.* Finally, the shared interest of the several states in furthering fundamental substantive social policies is coextensive with Massachusetts' substantive interest in ensuring that valid contracts and their warranties are not breached. *See id.* Because a Massachusetts corporation has allegedly been damaged through the breach due to lost charter business and a yacht that fails to meet contracted-for expectations, Massachusetts has the greatest interest in enforcing the contract in issue. *See id.*

As the *Rhode Island Hosp.* court observed, the Supreme Court in *Asahi* stated that " 'often the interest of plaintiff and the forum's [sic] in the exercise of jurisdiction will justify even serious burdens placed on a defendant.' " *Id.* (quoting *Asahi Metal,* 107 S.Ct. at 1034). Mindful of that admonition, this Court holds, despite the significant burden placed on Denison by litigating this action in Massachusetts, that the other *Asahi* factors sufficiently outweigh this concern to render jurisdiction reasonable.

## III. CONCLUSION

The Court holds, therefore, that it has personal jurisdiction over Denison and DENIES its motion to dismiss.